Truckla Services, Inc. v. US Army Corps of Engineers Truckla Services, Inc. v. US Army Corps of Engineers Mr. Ryan, please proceed. Thank you, Your Honor. Kent Ryan on behalf of Truckla Services. This is an appeal from the Armed Services Board of Contract Appeals for an affirmation of a termination by default against Truckla relative to certain work that was performed on an offshoot of the Mississippi River near Arkansas. It seems to me that the biggest problem you have is the fact finding in the record that there were subcontractors that were not willing to give you the barges you needed because you were $400,000 in debt and arrears to them and or they didn't have confidence in your ability to pay. So while there may have been some service subcontractors with barges who weren't willing to work with you because their barges were busy working in help of the BP oil spill, it seems that there were other subcontractors that this record demonstrates wouldn't work with you because of your financial scenario. And my concern is that that is the substantial evidence to support the lower tribunal's conclusion that it was in unforeseen circumstances that caused you to be unable to perform. So why don't you go to the heart of that and tell me what I'm missing The standard, of course, as Your Honor alludes to initially, is what is the force majeure or the excusable delay that we're allowed to. It's due to our fault, which the lower tribunal found was not due to our fault. So that's kind of off. So it simply is what's foreseeable. And I think it's not just the fact finding, but it's the standard that was applied by the board. What is foreseeable? Well, the case law that we've cited to the court and that's been uncontroverted by the government is how do you figure out what is foreseeable? Well, you figure it out by looking at what occurred. There's no doubt here that we're not at fault in causing this. There's no doubt here that in between the time that this contract went into a state period Wait, wait, wait, wait, wait, wait, wait. Back up. There's no doubt we're not at fault. And you say in the blue brief at 31, Trukla's default was technical at best. But the contract taking officer found that only 13% of the contract was completed. You argue that 20,000 tons of stone could be used to determine the amount of completion. But do you contest the 13% number? I don't see it in your blue brief. I don't contest the 13% number with respect to what the government claims was acceptable at an early point in time. And when I say at fault, I was trying to respond to Judge Moore's question about the issue of excusable delay. Okay, so you're not at fault for the BP oil spill. That's correct. Give me that. That's correct. And what the court also found was we were not at fault with respect to excusable delay to causing the reason that it came about, i.e., what the court said, because we didn't have long-term contracts. The tribunal didn't find that to be something that we were at fault for. Yes, but they also found that there were short-term contractors who weren't willing to work with you because you're a financial situation, not because of the oil spill. Correct. And that's the question that I was answering when Judge Wallach had a question which I'd like to address as well. But with respect to the excusable delay issue that Judge Moore has asked, the standard isn't that simply somebody can do the job out there. The standard is what did the contractor do to put itself in a position to be able to complete the contract? The language from, for instance, I think it's the Darwin case, is did we make diligent and continuous efforts to find subcontractors that could help us complete it? Did we use established methods to do that? But the board found we didn't, right? The board said there were two. One said we weren't available. That's what they said, actually.  And the other said we got concerns about your ability to pay. What we did is we put on evidence. Well, we were also concerned about the fact that you put the stone in the wrong place. What stone? Not the subcontractors. The government was, but the subcontractors were not. So it's two different issues. The excusable delay that Judge Moore, I believe, focused on is one issue that we do take issue with. So the excusable delay issue is how do you define that standard of what's foreseen? I think Judge Moore's question was didn't the board find that it was foreseeable, and that's evidenced by the fact that two contractors out of literally countless gave a no to us. And I think that's too stringent of a standard for determining unforeseeability. But it's a question of fact, isn't it? Is it a question of law or fact? I think it's a question of law when you apply the standard. If I concede for purposes of this argument. Wait, whether something is foreseeable or not you think is a question of law? I think the standard itself, when you look at the law, whether you made continuous and diligent efforts to find subcontractors, whether you used established methods within the industry to find them, that's the underlying standard of foreseeability. Isn't that part of the board's point is that there were two that you talked to. One said we're not available. The other said we wouldn't work with you. But there were others out there that were doing short-term work, and those you didn't even seek out. I don't think the board actually found that there were others that were out there. The evidence we put on was that everybody else was in use for BP. We put on an uncontroverted expert who was familiar with that who said everybody wanted to go down there and get the premium dollars that was being paid by BP to clean up the Gulf Coast. The only evidence the government put on was these examples of two people, albeit letters we provided them, who said, one, I don't want to work with you because I'm too busy with no reasons why, although it's a reasonable inference maybe they wanted to get down to the Gulf Coast and make more money, or two, we had concerns about paying. And when you get back to what the definition of what unforeseeable is, I suggest that's a legal standard. Well, let me ask you this. Community standards in that area, isn't it foreseeable that if you don't pay somebody, they won't work with you? In the context of that single one, yes. But, again, the standard is the market. The standard is the market, not one particular person. The testimony of Mr. Heidelberg, who is the principal in Trukla, the testimony of the surveyor, who's got vast familiarity with these types of pieces of equipment, was... How can you meet the diligence requirement if your reputation is such that people won't do business with you? Because the reputation was, and the only testimony was by Mr. Heidelberg, was that usually I got this equipment all the time. I never had trouble doing it. I'd done this kind of work before for the Corps of Engineers. I've been in accommodations for them for doing it in the past. I've never had a problem before. And it wasn't until BP occurred that I started having trouble. What do we do with the fact that even what you did wasn't done properly? I mean, there isn't a lot of dispute over that. I mean, the board specifically found that it wasn't tied in properly, that you did not do the work pursuant to the contract. The tie-in was, again, the backdrop of the facts. The job started in December. The contract said this kind of work can only be done from July 15th to December 15th. They issued a notice to proceed. We started in a timely manner. We got to about December, I think it was 17th or 18th, and had to stop due to contractual reasons. High water, holiday season, and then the fish spawning season. The wrong azimuth didn't have anything to do with the season, did it? No, it didn't. But my point in answering her question is that it might have been technically incorrect because it went off in the wrong azimuth. But what the evidence established before the termination was despite that, and that gets in the argument of a technical default, which the cases we cited in the court say you can't default somebody simply because you don't technically meet something, particularly if you get what you bargained for. And the testimony was uncontroverted by our expert and even by the cores in people where we ultimately looked at this and, say, went off some of them in the wrong direction, but they worked and they were working. Time out, time out. The stone was not satisfactorily placed where it was supposed to be. When you say it worked, perhaps it worked to some degree, but not to the same degree it would have worked much more effectively had it been placed where it was specified under the contract. And this, I mean, you don't want to be bothered by technicalities, but that's the law, and you signed a contract, and the contract required it to be placed in certain locations, and you didn't place it in any of those locations. You put it elsewhere. Did it work some? There's evidence it did. But there's no evidence that it worked the same degree as it would have worked if it was placed where it was supposed to be. So, I mean, I put it in the wrong place. You built this thing in the wrong place. They were built in the right place. Thirteen places. They went off in some different directions. The point, Your Honor, however, is there's no evidence they didn't work to the degree that you're suggesting, that of a lesser degree. There's no evidence of that whatsoever. It's not their burden. You breached the contract by not putting them in the right place, so it was your burden to prove they worked just as well in that place. If you want to try to get around the fact that you didn't sign the contract. And we did because we put an expert, getting back to the case before us, expert testimony who evaluated this at the time. And, by the way, if it worked just as well, then why did the government hire another subcontractor to come in and move all the stone and then pay them? Why, if it worked just as well, why did the government decide, no, it couldn't stay where it was, it had to be moved, and they went through the exercise of paying someone else to move it? They didn't. That's the issue. They did. They hired a subcontractor. They hired a subcontractor to do nothing with respect to the work that we did. They came in, they moved the stones. No. They said they tried to move the stones. The contract was to move the stones. When they got out there, they didn't move the stones. Mr. Emerson is the one that testified in that regard. He was their very expensive quality assurance officer who went out on scene and said, we didn't move any stones. The testimony in the contract was clear. But it wasn't because the government didn't want them moved. It was because the way you did it made it virtually impossible to move them. No, because once they got out there, what they found, they were working because they silted up just like they're designed to do. That's right. The testimony is it was impossible to move all that stone. It was too hard to move it all, so instead they had the subcontractors add stone to it so that they would make it more functional. No, they only added stone to the tie-in, which was the point that we don't deny that we never got to the tie-in because we had to stop the contract due to the excusable delays. So it was always considered that we would go finish it and tie it in. It wasn't complete. But once the only new stone they added was the tie-in, which was not what they faulted us for. They faulted us for the direction what was already there. And so they tied it in. That's where the new stone came from. That's on my recollection. You're well into your rebuttal time. If you'd like to keep going, you can, but this is your rebuttal time. Thank you, Your Honor. Okay. Let's hear from—tell me how to say your name. Oniema. Ms. Oniema. Oniema. Please go to the side. May it please the Court. I start out by enlightening us about the added stone that the new contractor put in. That's correct. There was some testimony from some of the witnesses from the Corps that PTM, when they came in to try to remediate this work, tried to locate some of the stone. Now, because the stone is all underwater, it's difficult to tell where everything was. But they were able to, according to one government witness, locate some of the stone, but they weren't ultimately able to reposition it as it should have been under the contract. So ultimately, the stone was not completely placed appropriately. No, my question is added stone. That is, my recollection is that the new contractor said, well, we can't use this, so they added additional stone. Was it only for tie-ins? My understanding, and on page 533, I believe, of the record, is that they located stone that was already there and moved that stone around. And then I believe they added some additional stone. But there was an issue in terms of them being able to position it. One of the things that does bother me here is that the government only paid for a minor amount of the stone that was actually placed. Now, I get the fact that the government didn't think it was placed properly, but there was actually stone used. Then, and so, you know, I see a domino effect here. So then they don't have enough money to pay their subcontractors, and then they end up with further delay. And yet then when the government goes back and makes a claim against the surety, the government gives the surety credit for more stone than they gave Tuckler credit for. How did all of a sudden there be more stone the government felt it should have paid for once you're dealing with the surety when you hadn't paid Tuckler for that stone? Well, in terms of the payment, the partial progress payment, I believe it was in February of 2010. At that point in time, the agency didn't have all the survey data in. Based on what they did see, they believed that only a percentage of it should be paid for. Now, later on, when they're separately negotiating this takeover agreement, they're then looking at it from the context of needing to also remediate the work and then possibly place new stone. And so in terms of the calculation as to the fact that it was more stone, it's not entirely clear where those numbers came from. It does appear that they were some sort of estimates. The progress payment was an estimate. So did the government contribute to the delay by breaching the contract in the first instance and not making an appropriate progress payment? No, Your Honor, they didn't contribute to the delay. What they did is they made a payment that was partial. Under the contract, none of the work was conforming, so they could have withheld all money, but they said that they wanted to mitigate Tuckler's work moving forward to help them be able to move forward with remediating the work on the hard points and continuing the work for the larger portion of the contract for the crock craft. So they did, in a way, try to assist Tuckler by helping them with this partial progress payment. And so the question, it seems like Tuckler's really raising almost like an unjustified question. Was it 7,000 tons? It was 7,000 tons, that's correct. And you gave the surety credit for that. That's correct. How could you be that far off in terms of the partial payment? It's unclear, Your Honor, and I agree. There is some confusion as to the exact tonnage, and part of that may be that when you're dealing with work that's underwater and you're using survey data in large part to try to figure out what work is conforming and what work is not conforming, there can be a question as to the precise amount. But ultimately, Tuckler abandoned the site and left the stone there, and the stone was left and needed to be repositioned. And so when working with the surety, that was the estimate that the agency, the Corps, came up with in terms of how much work needed to be remedied versus new work that needed to be laid. I guess I'm just having a little trouble with the delay problem when had you paid them for the 7,000 tons, they would have had the money to pay the subcontractor. They wouldn't have been in the financial trouble that you found caused the delay in the first place. Respectfully, Your Honor, they were only entitled to payment for stone that was satisfactorily placed, and none of the stone was actually satisfactorily placed. None of it conformed with the contract requirements in any way whatsoever. But ultimately, the Corps said that some of this work can be fixed with minimal corrections. Well, how did you know it wasn't all satisfactorily placed when you said you couldn't find it with the survey data? Well, the survey data showed that it was not satisfactorily placed. And so there were initial surveys that were completed right when the stone was being laid in early December, and then there were bigger surveys that were conducted in the spring of 2010 by a third party. And that survey data showed serious problems with the alignment of the hard points. How were these errors made? I mean, it should be pretty easy to stand on the bank with a lensatic compass and shoot an azimuth. Well, what the survey data showed was that the rocks were just placed, where in some portions there was too much rock, other places there wasn't enough. But that doesn't have anything to do with the wrong bearing. With the wrong bearing? Location. Oh, correct, the wrong location. No, I think that's correct, Your Honor. The hard points were put in the wrong place, but the contracting office still accepted the mislocation, assuming that Trukla was going to be remedying the hard points that were created and constructed in that location. The partial payment was contingent on them fixing it, right? That's correct. So the partial payment wasn't, you did some of the work right, so we're going to pay you for it, or we're going to pay you for the stone, even though it's in the wrong place. It was, we'll give you a partial payment contingent on you fixing it. That's correct, and there was a number of specific elements that Trukla needed to meet in performing this remedial work. And there was no further work that was done on the site after they left in December of 2009. What's your response to your friend's argument that actually there was no evidence that what they did didn't work just as well as what the contract would have provided? Well, Your Honor, this gets into an issue of substantial evidence and the factual findings that the board made. There was certainly testimony from both parties regarding how the hard points worked. For example, Trukla did offer an expert saying that they were, while they didn't meet the contract requirements, they still met, I believe, the design function, while the court offered their own expert who said that while they may be marginally acceptable to support the design function, they're not going to function in the long term because there's a concern of erosion. And the board acknowledged this conflicting testimony and found that the court had provided a credible witness and made that credibility determination. So there was certainly evidence to support within the context of substantial evidence a finding that the work was not conforming. What about his argument about foreseeability? I mean, it does seem like most of the barges were caught up in use of correcting the BP oil spill. So it turns out that there were one, maybe two subcontractors that wouldn't work with them for other reasons. But why doesn't that still create an unforeseeability exception for them? Because there were lots of subcontractors willing to work with them, they just couldn't because they were caught up in all their, all their barges were out helping with the oil spill. Well, the court weighed conflicting factual evidence on this issue. For example, the contracting officer offered testimony noting that for other projects that the Corps was involved with, they were unaware of contractors indicating that the oil spill was causing delay for them. There was also evidence, so there were two contractors. Other contractors using spud barges? I don't recall if they said spud barges, but they said that the contracting officer had testified that she was unaware of other contractors having difficulty because of the oil spill. Now, there was testimony that Truck Club presented regarding, I believe, five additional contractors they contacted who said they were unavailable. I don't recall from the trial testimony whether or not they actually said that they were unavailable from the oil spill. I believe that was on pages 94 through 96 of the record. But they did say they were unavailable. However, both Patent Tully and Upper Marine both specifically raised concerns about, financial concerns regarding Truck Club. And then Patent Tully also was unavailable and hedged in different times as to when it could be available. So ultimately, as a factual matter, the contracting officers faced the situation where we're now behind schedule. The contract completion date has come and gone, and you've identified a contractor who has said that they might be available, but they haven't signed on. So again, we're dealing within the realm of factual evidence and substantial evidence. And the fact that the board could have reached a different conclusion is not a basis to overturn the decision there. If the court has no further questions, we respectfully request that the court affirm. Okay. Mr. Ryan, do you have some rebuttal time? Thank you, Your Honor. A couple of points. One with respect to the amount that we laid and got paid for. We originally invoiced for the 22,000 tons that were actually laid out there, and it's uncontroverted that's what we laid out there. In fact, the QAR at the time was there and substantiated the figure. Then once we go off for delay period, they say, wait a minute, we've got some problems with this. Invoices for this smaller amount. So we did because we needed money. They do surveys. They look at it. The internal engineers of the Corps of Engineers find them acceptable. The evidence in the record shows they found them acceptable and marginally acceptable. And marginally meant they're okay the way they are, but if they get slightly more off, which they weren't because we were done with that part of the work, then they wouldn't be. So the evidence is they were indeed acceptable. Where's your evidence that that's what marginally means? It was testified to by Mr. Shouse, and it's quoted in my brief specifically, that what he defined as marginal being, it means it's okay, it's acceptable. I'm paraphrasing, but it's in my brief. We cite it from the record. And he says, what I mean by marginally is it's okay right now, but if it goes off anymore, it won't be acceptable. And that was the description in our brief by Mr. Shouse, who was their expert and internal engineer. And after all this occurs in June. Well, is the government attorney correct or incorrect when she said there was competing evidence that suggested that while it might be functioning now, due to erosion it was likely to be less efficient or functional going down the road? You made the point. The only evidence was not that it was likely. The words your Honor just used, and I would suggest she didn't say it either, the testimony of Mr. Pinker, their expert, was the best he could say on two different times he was asked was, it's potential. And potential doesn't meet the standard of proof necessary for expert or otherwise to prove the point of whether or not they're getting what they bargained for, which is an effective system. Potential is not enough. Is that what they bargained for? I thought what they bargained for was a very specific contractual requirements. And what you're saying is I can ignore the contract as long as I give you what I think you need. You're arguing substantial compliance. Are you not? To a degree I am. And substantial compliance requires that in order to substantially comply it not be potentially incompetent. But the burden of proof at trial is you've got to give a preponderance of the evidence, or in this case substantial evidence, that it's not going to meet what the design criteria are. That's where the engineering comes in. And it's not unlike the McDonald case where the government wanted an aircraft and it didn't meet the weight requirements. They ultimately were terminated for fault, and they basically said the off weight doesn't affect the performance of the aircraft. It was wrongfully terminated. It's the same concept. Just because they didn't go in one particular direction doesn't mean they didn't work as a system. And the government engineers admitted that. As a system it worked. Now, they didn't bargain for necessarily specs. That's too high of a burden, particularly considering this drastic remedy. And that's what the cases say. The McDonald case, the Darwin case, the Eden case, is that that's too strict. Did you get what you were looking for ultimately? And I would like to address before my time runs out this notion of payment because in June of 2010, Richard Jones, who was one of the higher-ups of the Corps, said at the time to Mr. Pinkert, one of the engineers, the government has received benefit from the stone and might have some obligation to recompense the contractor forth. This is months and months after they've already paid us the minuscule amount. They're recognizing that they've gotten the benefit out of this because they've already gotten the memos, the testimony of Mr. Pinkert that said these are acceptable. They're just not pretty. Okay, Mr. Ryan, your time is up. I thank both counsel for the argument. The case is taken under submission.